## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| WILLIAM D. REINHARDT, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENERGY TRANSFER LP, KELCY L. WARREN, JOHN W. MCREYNOLDS, and THOMAS E. LONG,<br><br>Defendants. | **Case No. 3:19-cv-2771**<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff William D. Reinhardt ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Energy Transfer LP ("Energy Transfer" or the "Partnership"), analysts' reports and advisories about the Partnership, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Energy Transfer securities between February 25, 2017 and November 11, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Partnership and certain of its top officials.

2.      Energy Transfer was founded in 2002 and is based in Dallas, Texas.   The Partnership was formerly known as Energy Transfer Equity, L.P. and changed its name to Energy Transfer LP in October 2018.  Energy Transfer operates as a subsidiary of LE GP, LLC.

3.      Energy Transfer provides energy-related services in the U.S. and China.   The Partnership owns and operates approximately 9,400 miles of natural gas transportation pipelines and three natural gas storage facilities in Texas; and approximately 12,200 miles of interstate natural gas pipelines.

4.      Energy Transfer's projects include the Mariner East pipeline, a multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania.  According to the Partnership's SEC filings, the Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including the Partnership's Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. Additionally, the first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014

and the first quarter of 2016, respectively.  The second phase of the project, referred to as Mariner East 2, began service in December 2018.

5.      On February 13, 2017, the Pennsylvania Department of Environmental Protection ("PADEP") approved water-crossing and sedimentation permits for the Mariner East 2 pipeline, which would transport natural-gas liquids across Pennsylvania to a terminal in Marcus Hook. According to news sources, the permits were believed to be the final regulatory hurdle to begin construction of the pipeline.

6.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Partnership's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Energy Transfer's permits to conduct the Mariner East pipeline project in Pennsylvania were secured via bribery and/or other improper conduct; (ii) the foregoing misconduct increased the risk that the Partnership and/or certain of its employees would be subject to government and/or regulatory action, thereby depreciating the Partnership's unit value; and (iii) as a result, the Partnership's public statements were materially false and misleading at all relevant times.

7.      On November 12, 2019, the *Associated Press* reported that Energy Transfer's Mariner East pipeline project was under investigation by the Federal Bureau of Investigation ("FBI").  Citing interviews with current and former state employees, the *Associated Press* reported that the FBI's investigation "involves the permitting of the pipeline, whether [Pennsylvania Governor Tom] Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return."

8.      On this news, Energy Transfer's unit price fell $0.81 per share, or 6.77%, over the following two trading sessions, closing at $11.16 per share on November 13, 2019.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Partnership's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Energy Transfer is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Energy Transfer securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Energy Transfer is a Delaware corporation with principal executive offices located at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225.  Energy Transfer

common units trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "ET."

16.　　Defendant Kelcy L. Warren ("Warren") has served as Energy Transfer's Chief Executive Officer at all relevant times.  Warren also serves as Energy Transfer's Chairman of the Board.

17.　　Defendant John W. McReynolds ("McReynolds") served as Energy Transfer's President from March 2005 to October 2018.

18.　　Defendant Thomas E. Long ("Long") has served as Energy Transfer's Chief Financial Officer at all relevant times.

19.　　Defendants Warren, McReynolds, and Long are sometimes referred to herein as the "Individual Defendants."

20.　　The Individual Defendants possessed the power and authority to control the contents of Energy Transfer's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Energy Transfer's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Energy Transfer, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Energy Transfer was founded in 2002 and is based in Dallas, Texas.   The Partnership was formerly known as Energy Transfer Equity, L.P. and changed its name to Energy Transfer LP in October 2018.  Energy Transfer operates as a subsidiary of LE GP, LLC.

22.     Energy Transfer provides energy-related services in the U.S. and China.   The Partnership owns and operates approximately 9,400 miles of natural gas transportation pipelines and three natural gas storage facilities in Texas; and approximately 12,200 miles of interstate natural gas pipelines.  The Partnership sells natural gas to electric utilities, independent power plants, local distribution companies, industrial end-users, and other marketing companies.  The Partnership also owns and operates natural gas gathering and NGL pipelines, processing plants, treating facilities, and conditioning facilities in, among other states, Pennsylvania, and transportation and supply of water to natural gas producers in Pennsylvania.  The Company also owns approximately 4,769 miles of NGL pipelines; NGL and propane fractionation facilities; NGL storage facilities with working storage capacity of approximately 45 million Bbls; and other NGL storage assets and terminals with an aggregate storage capacity of approximately 11 million Bbls.

23.     Energy Transfer's projects include the Mariner East pipeline, a multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania.  According to the Partnership's SEC filings, the Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including the Partnership's Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. Additionally, the first phase of the project, referred to as Mariner East 1, consisted of interstate

and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively.  The second phase of the project, referred to as Mariner East 2, began service in December 2018.

24.     On February 13, 2017, the PADEP approved water-crossing and sedimentation permits for the Mariner East 2 pipeline, which would transport natural-gas liquids across Pennsylvania to a terminal in Marcus Hook.  According to news sources, the permits were believed to be the final regulatory hurdle to begin construction of the pipeline.

**Materially False and Misleading Statements Issued During the Class Period**

25.     The Class Period begins on February 25, 2017.  On February 24, 2017, during after-market hours, Energy Transfer filed an Annual Report on Form 10-K with the SEC, reporting the Partnership's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K").  With respect to the Partnership's corporate governance, the 2016 10-K touted that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics *applicable to our directors, officers and employees*, and Corporate Governance Guidelines for directors and the Board" (emphasis added).

26.     The 2016 10-K also noted that "[c]urrent copies of [the Partnership's] Code of Business Conduct and Ethics . . . are available on [the Company's] website."  The Code of Business Conduct and Ethics (the "Code") found on Energy Transfer's website stated, in relevant part:

> ***It is against the policy of the Partnership Group to authorize payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the Partnership Group.*** It is also contrary to the policy of the Partnership Group to employ any intermediary to make such payments or to disguise such payment(s) as a commission, refund or in any other manner. Should an Employee become involved in any situation where (i) a request is made for any Sensitive Payment or any bribe, kickback or other payment the propriety of which is questionable, or where (ii) the Employee has any knowledge of payments being made to an agent which are in excess of reasonable fees for services rendered, it is

the Employee's responsibility to report the situation immediately to his/her immediate supervisor.

(Emphasis added.)  The Code defines a "Sensitive Payment" as the following:

"Sensitive Payments" means both receipt and disbursements whether or not illegal, and include:

a) ***receipts from or payments to governmental officials or employees***;

b) commercial bribes or kickbacks;

c) amounts received with an understanding that rebates or refunds will be made in contravention of the laws of any jurisdiction, either directly or through a third party;

d) corporate political contributions; and

e) payments or commitments (whether cast in the form of commissions, payments or fees for goods or services received or otherwise) made with the understanding or under circumstances that would indicate that all or part thereof is to be paid by the recipient to governmental officials or employees, or as a commercial bribe, influence payment or kickback.

(Emphasis added.)

27.    The 2016 10-K also assured investors that Energy Transfer had, presumably in a lawful manner, obtained all applicable permits and other authorizations for the Company's various properties used for conducting its business, and that such permits were valid, stating, in relevant part:

We believe that we have satisfactory title to or valid rights to use all of our material properties. Although some of our properties are subject to liabilities and leases, liens for taxes not yet due and payable, encumbrances securing payment obligations under non-competition agreements and immaterial encumbrances, easements and restrictions, we do not believe that any such burdens will materially interfere with our continued use of such properties in our business, taken as a whole. In addition, we believe that we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business.

Substantially all of our subsidiaries' pipelines, which are described in "Item 1. Business" are constructed on rights-of-way granted by the apparent record owners of the property . . . . Our subsidiaries have obtained, where necessary, easement agreements from public authorities and railroad companies to cross over or under, or to lay facilities in or along, watercourses, county roads, municipal streets, railroad properties and state highways, as applicable. In some cases, properties on which our subsidiaries' pipelines were built were purchased in fee. ETP also owns and operates multiple natural gas and NGL storage facilities and owns or leases other processing, treating and conditioning facilities in connection with its midstream operations.

28.    With respect to the Mariner East pipeline, the 2016 10-K stated, in relevant part:

*NGL Pipelines*

Sunoco Logistics owns approximately 900 miles of NGLs pipelines, primarily related to the Mariner systems in the northeast and southwest United States.

- The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including our Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. The second phase of the project, referred to as Mariner East 2, will expand the total takeaway capacity to 345,000 Bbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the third quarter of 2017.

* * *

*NGLs Terminals*

* * *

- *Marcus Hook Industrial Complex.* In 2013, Sunoco Logistics acquired Sunoco, Inc.'s Marcus Hook Industrial Complex . . . . In addition to providing NGLs storage and terminalling services to both affiliates and third-party customers, the Marcus Hook Industrial Complex currently serves as an off-take outlet for the Mariner East 1 pipeline, and will provide similar off-take capabilities for the Mariner East 2 pipeline when it commences operations.

29.    Appended as exhibits to the 2016 10-K were signed certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants McReynolds and Long certified that

"[t]he [2016 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2016 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership."

30.     On February 23, 2018, Energy Transfer filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K").   The 2017 10-K, as with the 2016 10-K, touted the existence of the Code and its purported applicability to the Company's directors, officers and employees.   The 2017 10-K also contained representations substantively identical to those quoted in ¶ 27 above with respect to Energy Transfer's purportedly valid permits obtained for properties used in connection with its business.

31.     With respect to the Mariner East pipeline, Energy Transfer touted 300 miles of liquids pipeline and a pipeline throughput capacity of 70 MBbls/d.   In further discussing the Mariner East pipeline and its history, the 2017 10-K touted, in relevant part:

> The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including ETP's Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. The second phase of the project, referred to as Mariner East 2, will expand the total takeaway capacity to 345 MBbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the second quarter of 2018.

32.     Appended as exhibits to the 2017 10-K were signed SOX certifications, wherein Defendants McReynolds and Long certified that "[t]he [2017 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he

information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership."

33.     On May 3, 2018, Energy Transfer issued a press release, entitled "Mariner East 1 Released for Service by Pennsylvania Public Utility Commission," that generally touted the benefits provided by the Mariner East pipeline, its importance to the Pennsylvania local community, and the Company's resolution of recent regulatory hurdles that had stalled use of the pipeline.  Specifically, that press release stated, in relevant part:

> Energy Transfer Partners, L.P. (NYSE: ETP) announced today that its subsidiary, Sunoco Pipeline L.P. (SPLP), received a unanimous vote from the Pennsylvania Public Utility Commission (PUC) to resume operations of its Mariner East 1 pipeline. SPLP has worked diligently with the PUC's I&E Division and their outside experts on the matter for several weeks and is pleased that all investigations concur regarding the safety and integrity of the pipeline. The procedures to resume public utility service on the pipeline will begin immediately.
>
> Mariner East 1 is a major transporter of propane in Pennsylvania, which is ultimately delivered to local communities, providing affordable fuel to heat homes and run businesses. When Mariner East 1 was shut-in as a precautionary measure, there were no issues with the pipeline, which has been safely operating for decades. Its continued safe operation has now been verified by all parties.
>
> Mariner East 1 is part of a larger public utility system including the Mariner East 2 and Mariner East 2X pipelines, which are currently under construction. Mariner East 2 mainline construction is 98% complete and 93% of the HDDs are either complete, in-progress or have been released for restart. Mariner East 2 is a critical energy infrastructure project, not only for Pennsylvania's economy, but for the thousands of people it puts to work every day. The total potential economic impact from all Mariner East construction in Pennsylvania is estimated to be more than $9 billion, supporting approximately 9,500 total jobs each year over six years of construction, with estimated wages of nearly $3 billion. These projects provide an economic boost in the 17 counties where they are located and across the entire Commonwealth.

34.     On December 29, 2018, Energy Transfer issued a press release, entitled "Energy Transfer Announces Mariner East 2 Pipeline Is in Service," which also generally touted the benefits provided by the Mariner East pipeline, its importance to the Pennsylvania local

community, and the pipeline's availability for interstate and intrastate service.  Specifically, that

press release stated, in relevant part:

> Energy Transfer LP (NYSE: ET) announced that effective today its Mariner East 2
> natural gas liquids (NGLs) pipeline is in service, available for both interstate and
> intrastate service. The 350-mile NGL pipeline transports domestically produced
> ethane, propane and butane east from processing plants in Ohio across West
> Virginia and Pennsylvania to Energy Transfer's Marcus Hook Industrial Complex
> in Delaware County, PA, where the NGLs are stored for distribution to local,
> domestic and waterborne markets.
>
> Mariner East 2 is part of Energy Transfer's Mariner East system of pipelines
> designed to provide much-needed NGL takeaway capacity for the Marcellus and
> Utica Shale production areas in Eastern Ohio, West Virginia and Western
> Pennsylvania. The Mariner East 2X pipeline, which parallels Mariner East 2, is
> expected to be in service in late 2019. The Mariner East system will provide both
> operational flexibility and enhanced security of NGL supply from producing areas
> to key markets in the region and beyond.
>
> According to a 2015 economic impact study by EConsult Solutions, the total impact
> from the construction of the Mariner East pipelines is estimated to be more than
> $9.1 billion in Pennsylvania alone. When complete, the projects will have provided
> more than 9,500 construction jobs per year for six years, with associated earnings
> totaling more than $2.7 billion.

35.     On February 22, 2019, Energy Transfer filed an Annual Report on Form 10-K with

the SEC, reporting the Company's financial and operating results for the quarter and year ended

December 31, 2018 (the "2018 10-K").  The 2018 10-K, as with the 2016 10-K and 2017 10-K,

touted the existence of the Code and its purported applicability to the Company's directors, officers

and employees.  The 2018 10-K also contained representations substantively identical to those

quoted in ¶ 27 above with respect to Energy Transfer's purportedly valid permits obtained for

properties used in connection with its business, except that the 2018 10-K addressed the

Company's properties generally, without reference to subsidiaries.

36.     With respect to the Mariner East pipeline, Energy Transfer touted 670 miles of

liquids pipeline and a pipeline throughput capacity of 345 MBbls/d.  In further discussing the

Mariner East pipeline and its history, the 2018 10-K contained representations substantively identical to those quoted in ¶ 31 above, again removing references to its subsidiaries' ownership of relevant properties, and adding that service for the Mariner East 2 began in December 2018.

37.     Appended as exhibits to the 2018 10-K were signed SOX certifications, wherein Defendants Warren and Long certified that "[t]he [2018 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership."

38.     Finally, on April 23, 2019, Energy Transfer issued a press release, entitled "Energy Transfer Announces Mariner East 1 Pipeline Is Back in Service," which, as with the other press releases discussed herein, generally touted the benefits provided by the Mariner East pipeline and the Company's resolution of recent regulatory hurdles that had stalled use of the pipeline. Specifically, that press release stated, in relevant part:

> Energy Transfer LP (NYSE: ET) announced that effective today, Mariner East 1 pipeline has resumed operations. The 350-mile, 8-inch natural gas liquids (NGL) pipeline transports NGLs across Southern Pennsylvania to Energy Transfer's Marcus Hook Industrial Complex in Delaware County, PA.
>
> Energy Transfer worked closely with the Pennsylvania Public Utility Commission Bureau of Investigation and Enforcement (BI&E) throughout an extensive three-month investigation, through which Energy Transfer confirmed the integrity of the pipeline in the area of West Whiteland Township, Chester County, PA. The investigation also confirmed that at no time was Mariner East 1 ever destabilized in this area.
>
> Mariner East 1 is part of Energy Transfer's Mariner East system of pipelines designed to provide much-needed NGL takeaway capacity for the Marcellus and Utica Shale production areas in Eastern Ohio, West Virginia and Western Pennsylvania.

39.     The statements referenced in ¶¶ 25-38 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse

facts about the Partnership's business, operational and compliance policies.   Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Energy

Transfer's permits to conduct the Mariner East pipeline project in Pennsylvania were secured via

bribery and/or other improper conduct; (ii) the foregoing misconduct increased the risk that the

Partnership and/or certain of its employees would be subject to government and/or regulatory

action, thereby depreciating the Partnership's unit value; and (iii) as a result, the Partnership's

public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

40.    On November 12, 2019, the *Associated Press* published an article entitled "FBI

eyes how Pennsylvania approved pipeline.  The *Associated Press* article reported, in part:

> HARRISBURG, Pa. (AP) — The FBI has begun a corruption investigation into
> how Gov. Tom Wolf's administration came to issue permits for construction on a
> multibillion-dollar pipeline project to carry highly volatile natural gas liquids across
> Pennsylvania, The Associated Press has learned.
>
> FBI agents have interviewed current or former state employees in recent weeks
> about the Mariner East project and the construction permits, according to three
> people who have direct knowledge of the agents' line of questioning.
>
> All three spoke on condition of anonymity because they said they could not speak
> publicly about the investigation.
>
> The focus of the agents' questions involves the permitting of the pipeline, whether
> Wolf and his administration forced environmental protection staff to approve
> construction permits and whether Wolf or his administration received anything in
> return, those people say.

41.    On this news, Energy Transfer's unit price fell $0.81 per share, or 6.77%, over the

following two trading sessions, closing at $11.16 per share on November 13, 2019.

42.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Partnership's securities, Plaintiff and other Class members have suffered

significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Energy Transfer securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Partnership, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Energy Transfer securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Energy Transfer or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Energy Transfer;

- whether the Individual Defendants caused Energy Transfer to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Energy Transfer securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

49.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Energy Transfer securities are traded in an efficient market;

- the Partnership's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Partnership traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Partnership's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Energy Transfer securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

50.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

51.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

52.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

53.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

17

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Energy Transfer securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Energy Transfer securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

55.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Energy Transfer securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Energy Transfer's finances and business prospects.

56.     By virtue of their positions at Energy Transfer, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each

Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

57.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Energy Transfer, the Individual Defendants had knowledge of the details of Energy Transfer's internal affairs.

58.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Energy Transfer.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Energy Transfer's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Energy Transfer securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Energy Transfer's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Energy Transfer securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

59.     During the Class Period, Energy Transfer securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

of Energy Transfer securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Energy Transfer securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Energy Transfer securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

60.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Partnership's securities during the Class Period, upon the disclosure that the Partnership had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

62.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.     During the Class Period, the Individual Defendants participated in the operation and management of Energy Transfer, and conducted and participated, directly and indirectly, in the conduct of Energy Transfer's business affairs.  Because of their senior positions, they knew

the adverse non-public information about Energy Transfer's misstatement of income and expenses and false financial statements.

64.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Energy Transfer's financial condition and results of operations, and to correct promptly any public statements issued by Energy Transfer which had become materially false or misleading.

65.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Energy Transfer disseminated in the marketplace during the Class Period concerning Energy Transfer's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Energy Transfer to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Energy Transfer within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Energy Transfer securities.

66.     Each of the Individual Defendants, therefore, acted as a controlling person of Energy Transfer.  By reason of their senior management positions and/or being directors of Energy Transfer, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Energy Transfer to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Energy Transfer and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Energy Transfer.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 20, 2019                    Respectfully submitted,

*/s/ Willie C. Briscoe*
WILLIE C. BRISCOE
State Bar Number 24001788
**THE BRISCOE LAW FIRM, PLLC**
12700 Park Central Drive, Suite 520
Dallas, TX  75251
Telephone: 972-521-6868
Facsimile: 281-254-7789
wbriscoe@thebriscoelawfirm.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*